IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ALEATHER THOMPSON        )     CASE NO. 1:07CV0783

       Plaintiff,           )     JUDGE DONALD C. NUGENT

vs.                      )

UHHS RICHMOND HEIGHTS   )     **PLAINTIFF'S MEMORANDUM IN**
HOSPITAL, INC., *et al.*       )     **OPPOSITION TO DEFENDANTS'**
                       )     **MOTIONS FOR SUMMARY**
       Defendants,      )     **JUDGMENT**

SANDRA J. ROSENTHAL (0040215)
75 Public Square, Suite 1300
Cleveland, OH 44113
(216) 696-9936
Fax (216) 621-9640
E-mail: br25423@aol.com

DAVID A. FORREST (0006673)
JEFFRIES, KUBE, FORREST & MONTELEONE
CO., L.P.A.
1650 Midland Bldg.
101 W. Prospect Avenue
Cleveland, OH 44115
(216) 771-4050
Fax (216) 771-0732
E-mail: dforrest@jkfmlaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

I.    INTRODUCTION ................................................................ 1

II.   STATEMENT OF THE FACTS ................................................ 1

      A.    Lisa Thompson and her Qualifications for her Career
            In the Culinary Field ..................................................... 1

      B.    The Organizational Structure of UH's Nutrition Services
            Department and the Joint Employment Relationship Between the
            Hospital and the Food Service Companies ......................... 4

      C.    The Rampant Racial Discrimination in UH's Nutrition Services
            Department .................................................................. 5

      D.    The Events that Led to Ms. Thompson's Termination and the
            Violation of her Rights Under the FMLA ........................... 8

III.  LAW AND ARGUMENT ...................................................... 13

      A.    Principles Applicable to Motions for Summary Judgment .......... 13

      B.    Defendants Discriminated Against Ms. Thompson ................. 14

            1.    The *Prima Facie* Case ........................................ 15

            2.    Defendants' Reason for Terminating Ms. Thompson is a
                  Pretext for Their Discriminatory Conduct .................. 17

      C.    Defendants Subjected Ms. Thompson to a Racially Hostile
            Work Environment ........................................................ 19

      D.    Defendants Retaliated Against Ms. Thompson ..................... 20

      E.    Defendants Violated the FMLA ........................................ 20

            1.    UH and Sodexho Were Joint Employers .................... 21

            2.    Defendants Interfered with Ms. Thompson's Rights Under
                  The FMLA ........................................................ 23

i

IV.    CONCLUSION ..................................................................................    24

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE

*Anderson v. Liberty Lobby,Inc.*
477 U.S. 242 (1986) ……………………………………………………    13

*Anthony v. BTR Automotive Sealing Systems, Inc.*
339 F.3d 506 (6th Cir. 2003) ……………………………………………    14

*Blair v. Henry Filters, Inc.*
505 F.3d 517 (6th Cir. 2007) ……………………………………………    15

*Cleveland Civil Service Comm. v. Ohio Civil Rights Comm.*
57 Ohio St. 3d 62 (1991) …………………………………………………    15

*Conrad v. Chaco Credit Union, Inc.*
946 F.2d 894 (6th Cir. 1991) ……………………………………………    17

*Durham Life Ins. Co. v. Evans*
166 F.3d 139 (3rd Cir. 1999) ……………………………………………    17

*Genaro v. Central Transp., Inc.*
84 Ohio St. 3d 293 (1999) ………………………………………………    14

*Grace v. USCAR*
521 F.3d 655 (6th Cir. 2008) …………………… …………………………    21, 22, 23

*Harris v. Forklift Systems, Inc.*
510 U.S. 17 (1993) ………………………………………………………    19

*Hoge v. Honda of Amer. Mfg., Inc.*
384 F.3d 238 (6th Cir. 2004) ……………………………………………    23

*Hudson v. Insteel Industries, Inc.*
Case No. 99-6217 (6th Cir. February 23, 2001), *unreported,*
2001 U.S. App. LEXIS 3214 …………………………………… ……………    17, 18

*Internat'l Bhd. Teamsters v. United States*
431 U.S. 324 (1977) ………………………………………………………    15

*Johnson v. U. of Cincinnati*
215 F.3d 561 (6th Cir. 2000) ……………………………………………    14

iii

*Killian v. Yorozu Automotive Tennessee, Inc.*
454 F.3d 549 (6th Cir. 2006) …………………………………………….. 23

*Leonard v. Dixie Well Service & Supply*
828 F.2d 291 (5th Cir. 1987) …………………………………………… 13

*Little Forrest Med. Ctr. of Akron v. Ohio Civil Rights Comm.*
61 Ohio St. 3d 607 (1991) ………………………………………………. 14

*Lynn v. Regents of the Univ. of California*
656 F. 2d 1337 (9th Cir. 1981), *cert den'd* 459 U.S. 823 ………………………… 17

*Manzer v. Diamond Shamrock Chems. Co.*
29 F.3d 1078 (6th Cir. 1994) ………………………………………….. 18

*Mauzy v. Kelly Services, Inc.*
75 Ohio St. 3d 578 (1996) ………………………………………………. 15

*McDonnell Douglas Corp. v. Green*
411 U.S. 792 (1973) ……………………………………………………. 15, 16

*Monette v. Electronic Data Systems Corp.*
90 F.3d 1173 (6th Cir. 1996) …………………………………………. 15

*New Jersey Life Ins. Co. v. Getz*
622 F.2d 198 (6th Cir. 1980) …………………………………………. 13

*Reeves v. Sanderson Plumbing Prod., Inc.*
530 U.S. 133 (2000) …………………………………………………… 14, 15

*Talley v. Bravo Pitino Restaurant*
61 F.3d 1241 (6th Cir. 1995) …………………………………………. 15

*Tarver v. Calex Corp.*
125 Ohio App. 3d 368 (1998) ………………………………………….. 19

*Tee-Pak, Inc. v. St. Regis Paper Co.*
491 F.2d 1193 (6th Cir. 1974) ……………………………………….. 13

*Thurman v. Yellow Freight Sys., Inc.*
90 F.3d 1160 (6th Cir. 1996) …………………………………………. 17

*Wexler v. White's Fine Furniture*
317 F.3d 564 (6th Cir. 2003) …………………………………………. 23, 24

*Williams v. Nashville Network and Gaylord Entertainment Co.*
132 F.3d 1135 (6th Cir. 1997) ........................................................ 20


<u>RULES</u>

Fed. R. Civ. P.56(c) ..................................................................... 13

29 U.S.C. 2614 ............................................................................ 21

29 U.S.C. §2614(a) ..................................................................... 23

29 U.S.C. §2615(a)(1) ................................................................. 23

42 U.S.C. §1981 ....................................................................... 1, 14, 24

29 C.F.R. §825.106(a) .............................................................. 21, 22

29 C.F.R. §825.106(b) .................................................................. 22

29 C.F.R. §825.106(d) .................................................................. 22

29 C.F.R. §825.220(a)(1) ............................................................. 22

R.C. 4112 ................................................................................. 14, 24

R.C. 4112.01(A) .......................................................................... 14

R.C. 4112.02 ............................................................................. 1, 14

R.C. 4112.02(A) .......................................................................... 14

## I.    INTRODUCTION

This is an employment action brought by Plaintiff, Aleather ("Lisa") Thompson, against Defendants, UHHS Richmond Heights Hospital (hereinafter "UH"), Sodexho Management, Inc. (hereinafter "Sodexho"), and Steve Savanick for losses she sustained as a result of Defendants' discriminatory and retaliatory conduct.  Plaintiff's Complaint[1], filed March 16, 2007, alleges claims for violation of the Family Medical Leave Act ("FMLA")[2], and race discrimination and retaliation under RC 4112.02 and 42 U.S.C. §1981.  UH and Sodexho were joint employers responsible for managing the personnel in the Nutrition Services Department and both are liable for the violation of the FMLA and their discriminatory treatment of Ms. Thompson.  Contrary to Defendants' contentions, Ms. Thompson's termination was not due to a "proposal" submitted to UH as part of Sodexho's sales pitch.  Her termination occurred because of the actions of Sodexho's on-site managers and UH management.  Ms. Thompson's position responsibilities were not replaced.  Ms. Thompson was replaced by an unqualified Caucasian male in a differently titled, but basically identical position.

## II.    STATEMENT OF THE FACTS

### A.    Lisa Thompson and her Qualifications for her Career in the Culinary Field

Lisa Thompson prepared well for a career in the culinary arts.  She received her certification from the Baltimore International Culinary Arts Institute in May, 1980.  Prior to that,

---

[1]Plaintiff's original Complaint named as defendants UHHS Richmond Heights Hospital and University Health Agent for UHHS Richmond Heights Hospital.  After learning of Sodexho's and Steve Savanick's involvement in the matters at issue, Plaintiff filed an Amended Complaint on August 30, 2007 eliminating University Health Agent for UHHS Richmond Heights Hospital as a defendant and adding Sodexho and Steve Savanick.

[2]Contrary to Defendants' contention in their Motions for Summary Judgment, Plaintiff has not alleged a claim of FMLA retaliation, but rather a claim for interference under the Act.

1

she completed a course in food service sanitary management sponsored by the Environmental Health Administration for the State of Maryland in January, 1980.  (Thompson Affidavit, paras. 21-22; Thompson Depo. at 119).

In addition to the training she received in Maryland, Ms. Thompson has had training during her employment with UH on supervising employees, training from the Cuyahoga County Board of Health on "Person in Charge" food safety (including training in HAACP), training on HIPPA security regulations, and training on how to educate employees on the chemicals used in the Nutrition Services Department. (Thompson Affidavit, para. 23).

Ms. Thompson's long career at Richmond Heights Hospital began when she was hired by the hospital in April, 1982 as a Production Cook.  When Richmond Heights Hospital became affiliated with Mt. Sinai Medical Center, Ms. Thompson was required to reapply for her position with Mt. Sinai.  Mt. Sinai continued as her employer until Sodexho Marriott (whose name was later changed to Sodexho) took over the food service management at the hospital and became Ms. Thompson's employer after she again was required to apply for her position.  UH became Ms. Thompson's employer in 2000 (again requiring Ms. Thompson to reapply for her position) when Richmond Heights Hospital became a part of University Hospitals Health System.  UH contracted with food service company Aramark to manage its Nutrition Services Department until early 2005.  Sodexho began managing the Department in June, 2005. (*Id.* at paras. 3-8; Savanick Depo. at 23).

In approximately 2001, Ms. Thompson was promoted to Food Production Supervisor.  As a Food Production Cook, Ms. Thompson had supervised the cooks in the kitchen (including scheduling, performing evaluations, and implementing discipline); was responsible for the food production in the hospital's kitchen and cafeteria; catered functions (set-up, cooking, and

2

serving); planned menus for the cafeteria, followed HAACP guidelines for sanitation, trained the

cooks, assisted the Executive Chef with cooking demonstrations (display cooking); and assisted

with inventory, ordering, and receiving.  (Thompson Affidavit, paras. 9-11).

As a Food Production Supervisor, Ms. Thompson supervised the entire kitchen and

cafeteria; catered functions (set-up, cooking, and serving); planned menus; made sure the

employees followed HAACP guidelines; ensured that the kitchen was in compliance with

HAACP guidelines; trained the kitchen and cafeteria staff; did display cooking; did scheduling;

performed evaluations, did the inventory, ordering, and receiving; and was responsible for

discipline.  She planned and put on holiday and themed food events where she decorated the

cafeteria, planned and prepared special menus, and created food event calendars.  In addition,

Ms. Thompson handled cash responsibilities when her supervisor was not on site.  She made sure

there was a certain amount in the safe deposit box and the cash register drawers at the beginning

of the day, counted down the cash register drawers and made sure there was the correct amount

of money in the drawers at the end of the day, took a register reading, made cash reports, and

made bank deposits. (*Id.* at 12-18; Savanick Depo. at 29; Thompson Depo. at 100, 111, 127, 129,

137).

Ms. Thompson received above-satisfactory work performance evaluations throughout her

employment with UH except for one evaluation given by Mr. Savanick which was not included

in her personnel file (see *infra* for further discussion regarding the Savanick evaluation).  UH

work performance evaluations carried ratings from 1-3, with 1 designated as "improvement

needed/unsatisfactory", 2 as "meets expectations", and 3 as "exceeds expectations."  Ms.

Thompson received the following official evaluation ratings in her supervisory position: 2001

rating 2.2; May 9, 2002 2.5; May 13, 2003 rating 2.85; March 4, 2004 rating 2.1; April 6, 2005

3

rating 2.5; 2005 (unsigned undated evaluation during the time Sodexho managed the Nutrition

Services Department) rating 2.2.  UH recognized Ms. Thompson for her service by naming her a

Service Superstar for outstanding achievement and excellence in March, 2001 and July, 2002.

(*Id.* at para. 26, Ex. 3).  Aramark Manager Jim Johnston praised Ms. Thompson for her

"outstanding contribution to Richmond Heights Hospital."  He noted that her "valuable

contribution to Richmond Heights Hospital and your personal commitment to your co-workers is

a representation of your dignity and honor as an individual."  (Thompson Affidavit, Ex. 4).

**B.      The Organizational Structure of UH's Nutrition Services Department and
        the Joint Employment Relationship Between the Hospital and the Food
        Service Companies**

When Aramark first took over the management of UH's Nutrition Services Department,

Aramark employee, Eric Kottheimer, managed the Department.  Mr. Kottheimer initially

reported to UH's Chief Operating Officer and later reported to Kris Bennett, UH's Director of

Finance and Support Services.  Aramark employee Jim Johnston subsequently replaced Mr.

Kottheimer (Bennett Depo. at 11, 13-14, 43, 46).

After Sodexho took over the management of the Department from Aramark, its

management team included General Manager Mary Henefeld and Executive Chef Steve

Savanick.  Sodexho also employed a clinical dietician on site.  UH employed the rest of the staff

in the Department. (Bennett Depo. at 23; Savanick Depo. at 24).

Mary Henefeld reported directly to Kris Bennett. She split her management duties

between UH and Bedford Heights Hospital, with the majority of her time spent at Bedford.

When she was absent from UH, Steve Savanick assumed her duties.  (Henefeld Depo. at 14-15,

22, 39).  Ms. Thompson reported directly to Mr. Savanick.  (Henefeld Depo. at 25).

4

UH and its food service Companies operated as joint employers with regard to the Nutrition Services Department. The food service managers could write up, discipline or terminate the UH employees in conjunction with UH's HR department. Likewise, UH could see to it that the food service employees were disciplined or terminated. Sodexho was bound by UH's and its own discrimination policy. (Bennett Depo. at 38-42).

Mary Henefeld and Steve Savanick each had contact with UH's HR Department regarding disciplinary matters and policies and procedures, though Mr. Savanick met with the HR Manager more frequently than Ms. Henefeld. The HR Manager held monthly meetings with Ms. Henefeld and Mr. Savanick where topics such as attendance and discrimination policies were discussed. (Newman Depo. at 26-29).

### C. The Rampant Racial Discrimination in UH's Nutrition Services Department

When Ms. Thompson first began her employment at Richmond Heights Hospital, she did not observe any racial discrimination in the Nutrition Services Department. Management and the employees got along very well. Ms. Thompson felt that they were like "family." (Thompson Affidavit, para. 27).

Matters changed when UH became Ms. Thompson's employer and Aramark took over the management of the Department. During Aramark's tenure, there were numerous instances of racial discrimination about which Ms. Thompson and some of the black employees complained. (Thompson Affidavit, para. 28; Bennett Depo. Exs. 13, 20; Bennett Depo. at 47-48; Newman Depo. at 36). Ms. Thompson complained about the racially discriminatory conduct of Aramark Manager Eric Kottheimer (that he gave the easier jobs to the white employees; that black employees were written up more often than the white employees). (Bennett Depo. at 47-48;

5

Bennett Depo. Ex. 13).  On one occasion, Mr. Kottheimer hung a civil war poster depicting African-Americans as slaves in the hall outside the cafeteria which Ms. Thompson had decorated in honor of Martin Luther King Day.  (Thompson Affidavit, para. 29).  As a result of Ms. Thompson's complaints about Mr. Kottheimer, UH requested that he be replaced.  (Bennett Depo. at 54).

The discrimination, however, continued with Mr. Kottheimer's replacement, Jim Johnston.  There were complaints again that the whites were assigned the easier jobs, that the kitchen employees were all black and the office employees were all white, that during state inspections Mr. Johnston made a black employee come in and help clean in the kitchen, but did not require a white employee to do so, that two white employees treated Ms. Thompson and another black employee "like they were off the street," and that Mr. Johnston would not eat with the black employees except once when the Department held a pizza party.  (Bennett Depo. Ex. 20).  When Ms. Thompson complained to Kris Bennett, UH"s Director of Finance and Support Services, about what she perceived as possible racial discrimination and told him that she had trouble communicating with Mr. Johnston, Mr. Bennett informed her that if she was unable to perform as a supervisor, perhaps she needed to step down.  (Bennett Depo. Ex. 16).

During Mr. Johnston's tenure, the employees expressed other concerns.  (Bennett Depo.. Ex. 20).  Ms. Thompson and Mr. Johnston worked successfully together to resolve the issues of employee morale, but the discrimination did not stop.  (Thompson Affidavit, paras. 32-33; Newman Depo. 94-95).

After Sodexho assumed management of UH's Nutrition Services Department for the second time in June, 2005, the instances of racial discrimination increased.  Steve Savanick gave the white employees preferential treatment.  Again, the black employees were required to

perform the harder, dirtier jobs. (Thompson Depo. at 131; Bogan Affidavit, para. 12). For example, When there was a state inspection, the black employees would be required to scrub the floors on their knees, scrub the walls, and clean the equipment whereas the white employees were not required to perform this type of work. UH's policy required that all non-management employees were expected to perform this work. (Bogan Affidavit, para. 12; Tobert Affidavit, para. 12). Certain white employees called off all the time, refused to perform their job duties assigned by Ms. Thompson, and talked back to Ms. Thompson, but were not disciplined for such conduct. If black employees had behaved in this manner, they would have been disciplined or terminated. (Bogan Affidavit, para. 15; Tobert Affidavit, para. 5; Jones Affidavit, para. 13; Thompson Depo. at 122 - 124, 139-140).

Mr. Savanick's treatment of Ms. Thompson reflected his racial prejudice. He did not permit her to implement discipline to the white employees, but allowed her only to discipline the black employees. (Thompson Depo. at 121; Bogan Affidavit, para. 14). He permitted her to prepare the evaluations for and discuss the evaluations with the black employees, but would himself evaluate the white employees.[3] (Thompson Depo. at 132). Whenever Ms. Thompson complained to him about a white employee's work performance, Mr. Savanick would tell her he would handle it, but if there was a concern with a black employee, Mr. Savanick would almost encourage her to write up the employee. (Thompson Depo. at 121).

-------------------

[3]Specifically, Mr. Savanick would tell Ms. Thompson which evaluations he had done, and would give her the names of the black employees whose evaluations she was to prepare. He approached her when she had already filled out evaluations for a white and a mixed race Asian-American employee, took the evaluations, and never returned them to her so that she could discuss them with the employees. (Thompson Depo. at 228-230).

7

The black employees expressed their concerns to Ms. Thompson about the discriminatory treatment in the Department.  Ms. Thompson approached Mr. Savanick about the employees' concerns regarding the unequal job allocation, but did not receive a satisfactory response. (Thompson Depo. at 139-140).  She met separately with HR Manager Martha Newman and Kris Bennett and complained about Mr. Savanick's discriminatory conduct and the way he discriminated against her and the other black employees.  (Thompson Depo. at 164, 167, 169-170, 172 -173, 259).  April Tobert, an African-American dietary assistant, also complained to Ms. Newman and Mr. Bennett about the racial discrimination in the Department.  (Tobert Affidavit, para. 7).  The complaints about Mr. Savanick were not investigated.  (Thompson Depo. at 164).

Despite Ms. Thompson's and the employees' complaints, UH and Sodexho have allowed Mr. Savanick to persist in his discriminatory conduct.  In September, 2006, after a meeting with Kris Bennett, the Chef Manger who replaced Ms. Thompson brought Mr. Bennett to the cafeteria where UH Nutrition Service employees Teresa Bogan, April Tobert, and Richard Eggleton were sitting.  They told him that Mr. Savanick was prejudiced, that the back employees were made to perform the hard jobs, and that the white employees were given preferential treatment.  They requested a meeting to address their complaints of discrimination, but the meeting never took place.  (Bogan Affidavit, para. 9; Tobert Affidavit, para. 8).

D.    **The Events that Led to Ms. Thompson's Termination and the Violation of her Rights Under the FMLA**

Ms. Thompson ran the Nutrition Services Department during the two month gap of time between Aramark's tenure and Sodexho's coming on site.  During that time, Mr. Savanick and Ms. Henefeld would check in once a week to see if everything was going okay.  Everything was

on target and they did not find fault with anything Ms. Thompson did.  (Thompson Depo. at 151).

When  Mr. Savanick began working on site at UH, he treated Ms. Thompson poorly and disrespectfully, did not want to communicate with her, and never backed her up with regard to her supervision of the employees.  (Thompson Depo. at 120; Bogan Affidavit, para. 16).  He found fault constantly with her, including instances when people complimented her on what a good job she did.  (Thompson Depo. at 151,153).

Sometime in early August, Steve Savavnick gave Ms. Thompson a poor evaluation with a rating of 1.2.  After she complained about the evaluation and someone came to the Department and complimented her on a catering job she had done, Mr. Savanick changed her rating to a 2.2 on an unsigned and undated evaluation form.  (Thompson Depo. at 133-134; Thompson Errata Sheet re p. 134; Thompson Affidavit, Ex. 3).  Ms. Thompson had already received an evaluation at the appropriate time in April, 2005 from Jim Johnston prior to the May, 2005 salary raises. HR Manager Martha Newman testified it would have been unusual and inappropriate for Ms. Thompson to have received an evaluation after May, 2005. (Newman Depo. at 45-47; Thompson Affidavit, Ex. 3).

Ms. Thompson complained on August 12, 2005 to Ms. Henefeld about the evaluation. Ms. Henefeld drafted an anecdotal note dated August 29, 2005 that was placed in Ms. Thompson's personnel file regarding the August 12th meeting.  Ms. Henefeld dredged up unsubstantiated issues (including an untrue complaint by an employee named Paulette Copeland that had surfaced in 2004 when Aramark, not Sodexho, was in charge, and issues regarding ordering and favoritism), and that had been addressed and resolved by Ms. Thompson, Jim Johnston, and the HR Manager.  (Savanick Depo. Ex. 3; Newman Depo. Exs. 20, 28). These

9

issues were never mentioned by Mr. Savanick in Ms. Thompson's evaluations. (Thompson Affidavit, Ex. 3). Ms. Henefeld testified that if Mr. Savanick had made a mistake in ordering or if there had been complaints of favoritism regarding him, these issues would not have been documented. She noted that everybody makes mistakes, not everybody likes each other, and that she would document only "sentinel" events like poisoning people because of unsafe food. (Henefeld Depo. at 44).

Ms. Henefeld and Mr. Savanick, in fact, planned to terminate Ms. Thompson. To accomplish this objective, they formulated a plan set forth in a memorandum dated August 16, 2005 to Kris Bennett titled "Proposed Staffing Changes." They proposed to eliminate the Nutrition Supervisor position and replace it with a Sodexho Chef 1, an entry level management position. That person would be responsible for "cook training, cafeteria and patient food presentation, HACCP, display cooking, and room service implementation from a production standpoint." The Chef 1 would also monitor the evening staff and handle the cafeteria cash collection. (Savanick Ex. 4; Henefeld Depo. at 54). The Chef 1 would also be responsible for some purchasing and menu development. (Savanick Ex. 4; Savanick Depo. at 63). Except for the evening schedule and the fact that the Chef 1 was not required to perform scheduling, Ms. Thompson had basically the same job responsibilities (and more) as the Chef 1 and was more than qualified to perform those duties. (Thompson Affidavit, paras. 9-18; Thompson Depo. at 100, 111, 127, 129, 137).

Ms. Henefeld testified that Sodexho provides what is designated as the "red book" which is the initial game plan for walking in the door of a new account. (Henefeld Depo. at 47). The "red book" in this case was the game plan that Sodexho presented to UH that is discussed in Robert Bucciarelli's Affidavit filed under seal by Sodexho as Exhibit A. The red book proposed

10

a half time Manager, a Chef Manager, and a Clinical Dietician.  While it did not include Ms.
Thompson's position, it also did not include the position of Executive Chef, the position held by
Steve Savanick.  (*Id.*).  ***Ms. Henefeld testified that "what the red book starts out as and what
ends up happening a year later ends up being completely different."*** (Henefeld Depo. at 50).
The red book is not a proposal, but serves only *as a guide map." (Henefeld Depo. at 48).  Mr.
Bennett testified that it was Ms. Henefeld's and Mr. Savanick's idea to eliminate Ms.
Thompson's position and that UH's elimination of Ms. Thompson's position was in response to
their proposal.  Mr. Bennett could have requested Sodexho to consider Ms. Thompson for the
Chef 1 position, but he chose not to do so.  (Bennett Depo. at 112, 117).

The elimination of Ms. Thompson's position would not necessarily save UH money.  UH
was responsible for paying for the Sodexho Chef Manager's salary.  (Henefeld Depo. at 55).

Ms. Henefeld's and Mr. Savanick's proposal also eliminated the kiosk and the person's
position who managed the kiosk.  That person was placed in another newly created position.
(Thompson Depo. at 103-105).

Sodexho has claimed that its proposal was geared to accommodate its planned At Your
Request ("AYR") program whereby the patients could order from their room at any time from
7:00 a.m to 6:30 p.m.  (Savanick Depo. at 63).  The only real difference from the food production
perspective was that the food would need to be cooked at different times.  (Thompson Affidavit,
para. 20).

While Ms. Thompson was still employed by UH, Sodexho advertized the Chef Manger 1
position sometime in late August, 2005.  (Savanick Depo. at 163-164).  Ms. Thompson was
unaware that her position was to be eliminated, and therefore did not apply for the Chef 1
position.  (Thompson Depo. at185).

11

Ms. Thompson finally learned on November 2, 2005 that she was terminated after she returned from FMLA leave.  She had taken a number of leaves under the FMLA during her employment with UH.  She  took an approved FMLA leave for depression October 22, 2005 through November 1, 2008.  Her original leave request ran through October 29, but she needed an extension of the leave to November 1st because of problems with her medication.  When she returned to work with the paperwork supporting the request for the extension, she was called into a meeting with the HR Manager, Kris Bennett, and Steve Savanick.  Mr. Savanick informed her that her position had been eliminated.  (Thompson Depo. at 85-86, Thompson Errata Sheet re p. 85; Newman Depo. at 112; Thompson Affidavit, paras 38-39).  She was not given the option to apply for other positions at UH or at Sodexho.  (Thompson Depo. at 88).

Defendants replaced Ms. Thompson in November with a Caucasian male named Jack Hart.  Mr. Hart was unqualified for the Chef 1 Manager position.  He informed Mr. Savanick prior to his hiring that because of a learning disability he could not be responsible to perform the ordering which was a requirement of his job.  (Affidavit of Jack Hart, paras. 1, 3-4).  Mr. Hart lacked formal culinary certification and Ms. Thompson's years of experience.  (Savanick Exs. 8 and 9).  Mr. Savanick found Mr. Hart unqualified as did the kitchen staff.  Jackie Jones, a dietary assistant was required to train Mr. Hart.  Another dietary assistant, April Tobert, needed to inform him of things that needed to be done.  He would tell her to write them down, and then would tell her to instruct the other employees what to do.  (Jones Affidavit, para. 8; Tobert Affidavit, para. 13; Bogan Affidavit, para. 6; Savanick Depo. at 155).

Mr. Savanick told Mr. Hart that Ms. Thompson was a trouble maker.  He said that three black African-American employees, Teresa Bogan, April Tobert, and Richard Eggleton were also trouble makers and instructed Mr. Hart to "get rid" of them.  (Hart Affidavit, paras. 5-7).  After

12

Mr. Hart complained about Mr. Savanick to Mr. Bennett, Mr. Savanick increased his abuse of Mr. Hart.  (Hart Affidavit, paras. 8-10, 14).

The staff observed that there was a great difference in the Department during the time Ms. Thompson supervised the Department and after her termination.  Ms. Thompson ensured the Department was adequately staffed.  Since Ms. Thompson's departure, the Department is frequently short staffed and the employees are overworked.  (Bogan Affidavit, paras. 4-5; Tobert Affidavit, para. 2).

## III.  LAW AND ARGUMENT

### A.  Principles Applicable to Motions for Summary Judgment

Summary judgment may not be granted if " the pleadings, depositions, answers to interrogatories, and admissions ... together with the affidavits ..." demonstrate a genuine issue of material fact or that the moving party is not entitled to judgment as a matter of law.  Fed. R. Civ. P. 56( c).  A fact is material if, under the substantive law governing the issue, it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  A genuine issue of material fact is present where the facts are such that, if proven at trial, "a reasonable jury could return a verdict for the non-moving party."  *Id.*[4]

Genuine issues of material fact exist with respect to each of Plaintiff's claims. Defendants are therefore not entitled to summary judgment.

---

[4] The evidence in the record together with any inferences therefrom must be construed in the light most favorable to the non-moving party (here, the Plaintiff).  *New Jersey Life Ins. Co. v. Getz*, 622 F.2d 198 (6th Cir. 1980); *Tee-Pak, Inc. v. St. Regis Paper Co.*, 491 F.2d 1193 (6th Cir. 1974) (papers supporting the movant are closely scrutinized while those of the opponents's are treated indulgently).  Finally, determinations of credibility, weighing the evidence, and the drawing of legitimate inferences are jury functions only.  *Anderson,* 477 U.S. 242.  ***Thus, the evidence presented by the non-moving party is to be taken as true.***  *Leonard v. Dixie Well Service & Supply*, 828 F.2d 291 (5th Cir. 1987).

## B.    Defendants Discriminated Against Ms. Thompson.

Defendants discriminated against Ms. Thompson because of her race, in violation of RC 4112.02 and 42 U.S.C. § 1981.   RC 4112.02(A) provides that it shall be an unlawful discriminatory practice:

> for any employer, because of the ... race ... of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

That Defendants are employers is not in dispute.[5]  42 U.S.C. § 1981 prohibits racial discrimination in the making of contracts. *Anthony v. BTR Automotive Sealing Systems, Inc.*, 339 F.3d 506 (6th Cir. 2003).  Claims brought under RC 4112.02 and 42 U.S.C. § 1981 are analyzed under the same standard of proof. *Johnson v. U. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000); *Little Forrest Med. Ctr. of Akron v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607 (1991).

The burden of proof in a disparate treatment case such as the one here was set forth by the United States Supreme Court in *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000).  The plaintiff must first establish a *prima facie* case of discrimination.  The burden then shifts to the defendant to produce evidence that the plaintiff was rejected, or someone else was preferred, because of a legitimate nondiscriminatory reason.  This burden is one of production, not persuasion. The plaintiff must then show by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext for discrimination.  The jury may infer

---------

[5]RC 4112.01(A) defines "employer" as "any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer."  The term person is defined broadly as "one or more individuals ... [and any] agent." *Id.*  Any manager or supervisor is subject to liability under RC 4112. *Genaro v. Central Transp., Inc.*, 84 Ohio St.3d 293 (1999).  Thus, UH, Sodexho, and Steve Savanick are subject to liability under Ohio's discrimination Statute.

14

that intentional discrimination occurred by finding that the defendant's proffered reasons were untrue. *Id.* In addition, Plaintiff need only prove that her race was a determining cause of her termination, not that it was the only reason. *Cleveland Civil Service Comm. v. Ohio Civil Rights Comm.*, 57 Ohio St.3d 62 (1991).

### 1.  The *Prima Facie Case*

A *prima facie* case creates an inference that an employment decision more likely than not was the product of discrimination. *Mauzy v. Kelly Services, Inc.*, 75 Ohio St.3d 578 (1996); *see also Internat'l Bhd. Teamsters v. United States,* 431 U.S. 324 (1977).  A plaintiff may establish a *prima facie* case by using the indirect method of proof articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173 (6th Cir. 1996); *Mauzy, supra.* Ohio law holds additionally that a *prima facie* case may be proved directly through the presentation of evidence of any nature to show that more likely than not the employer was motivated by a discriminatory animus.  *Id.*  In order to prove a *prima facie* case of disparate treatment based on race under the *McDonnell Douglas* test, the plaintiff must establish that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action or was discharged; (3) she was qualified for the position; and (4) she was replaced by a person outside her protected class.  *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241 (6th Cir. 1995).  As it relates to a summary judgment motion, the issue is the existence of a genuine issue of material fact at each stage of the *McDonnell Douglas* test.  *Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007).

The facts that Ms. Thompson is a member of a protected class (African-American), that she was discharged, and that she was replaced by a person outside the protected class (a Caucasian) are not in dispute.  Ample evidence, moreover, establishes that Ms. Thompson was

qualified for her position as well as for the entry level Chef Manager 1 position. These positions involved basically the same job responsibilities, except that Ms. Thompson's position entailed more responsibility as she did most of the purchasing and ordering as well as the scheduling. Ms. Thompson received her certification from the Baltimore International Culinary Arts Institute, had training in sanitary management and food safety (including HAACP), training in HIPPA, training on supervising employees, and training on how to educate employees on the chemicals used in UH's Nutrition Services Department. She has twenty-three years of culinary experience in a health care facility, including four years of supervisory experience in that field. She received commendations from UH and Aramark Manager Jim Johnston for outstanding service and earned excellent work performance evaluations. She never received less than a "meets expectations" rating on any of the categories on the evaluations that were included in her personnel file, and many times was rated as "exceeds expectations." As such, there are at the very least genuine issue of material fact as to Ms. Thompson's qualifications.

In addition to the evidence supporting Ms. Thompson's discrimination claims under the *McDonnell Douglas* formulation, there is ample evidence that ***directly*** proves a *prima facie* case of race discrimination. The racially hostile and discriminatory work environment in which Ms. Thompson worked shows the pervasive racism present in UH's Nutrition Services Department. The unequal allocation of jobs between blacks and whites, the fact that the racial discrimination in the Department was allowed to continue over a period of years, Mr. Savanick's refusal to allow Ms. Thompson to discipline the white employees and his encouraging her to discipline the black employees, Mr. Savanick's refusal to allow Ms. Thompson to evaluate the non-black employees, and his permitting the white employees to get away with not performing their required job duties show a pattern of pervasive race discrimination. Proof of a general pattern of

16

discrimination makes it more likely than not that a particular adverse employment action was the result of unlawful discrimination. *Conrad v. Chaco Credit Union, Inc.*, 946 F.2d 894 (6th Cir. 1991), *citing Lynn v. Regents of the Univ. of California*, 656 F.2d 1337 (9th Cir. 1981), *cert den'd* 459 U.S. 823. As one Court of Appeals explained:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.

*Durham Life Ins. Co. v. Evans*, 166 F.3d 139 (3rd Cir. 1999). The Sixth Circuit Court of Appeals has stated that all of the facts must be viewed together, not in isolation. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160 (6th Cir. 1996). The foregoing incidents of racial discrimination coupled with Mr. Savanick's disrespectful and critical attitude towards Ms. Thompson create a genuine issue of material fact with regard to her *prima facie* case.

## 2. Defendants' Reason for Terminating Ms. Thompson is a Pretext for Their Discriminatory Conduct.

Defendants have contended that they terminated Ms. Thompson because they eliminated her position to accommodate the At Your Request Program. They contend that the elimination of Ms. Thompson's position was contemplated all along, and that UH merely accepted Sodexho's initial proposal. Ample evidence shows that Defendants' contentions have no basis in fact and could not have reasonably motivated the Defendants to discharge Ms. Thompson.

Pretext is established where there is evidence that (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the adverse employment action; and (3) the proffered reasons were insufficient to motivate the adverse employment action. *Hudson v. Insteel Industries, Inc.*, Case No. 99-6217 (6th Cir. February 23, 2001), *unreported,* 2001 U.S.

17

App LEXIS 3214, citing *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078 (6th Cir. 1994).

Mr. Bennett's testimony established that it was Ms. Henefeld's and Mr. Savanick's idea to eliminate the Food Production Supervisor position and that Ms. Thompson's termination was in response to their proposal and not the so-called red book.  The Chef 1 position was basically the same as that held by Ms. Thompson.  UH could have requested that Ms. Thompson fill that position and Sodexho could have placed her in the position, but they deliberately chose not to do so.  Indeed, the other person whose job was eliminated was assigned to fill a newly created position in the cafeteria.  Further, the substitution of the Chef 1 position for the Food Production Supervisor position was not meant to save UH money as UH was to pay the salary of the Chef 1 in any case.  As for the AYR program, the only difference with respect to food production was that the food would need to be cooked at different times.

The evidence showing that Mr. Savanick treated Ms. Thompson disrespectfully and poorly, that he found fault with her constantly, and undermined her authority with the other employees raises a strong inference that Defendants' proffered reasons are false.  Ms. Henefeld and Mr. Savanick, moreover, gave Ms. Thompson an undeserved poor evaluation (later corrected) at a time when evaluations would not ordinarily have been given.  Ms. Henefeld accused her of made up events that were the subject of a disgruntled employee's complaint prior to the time Sodexho managed the Department.  Ms. Henefeld documented these matters despite her testimony that she would not ordinarily document these types of issues.

Defendants' true intent was to terminate Ms. Thompson because of her race, and not because they needed to eliminate her position.

**C.**    **Defendants Subjected Ms. Thompson to a Racially Hostile Work Environment.**

The racism in UH's Nutrition Services Department was pervasive and created a hostile work environment  The elements of a racially hostile work environment are as follows: (1) The claimant is a member of a protected class; (2) the claimant was subjected to unwelcome harassment; (3) the claimant objected to the unwelcome harassment; (4) the harassment was based upon race; and (5) the harassment had the purpose or effect of unreasonably interfering with the claimant's work performance or creating an intimidating, hostile, or offensive work environment. *Tarver v. Calex Corp.*, 125 Ohio App.3d 368 (1998), *citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993).

As discussed at length in the Statement of the Facts, *supra*, Defendants treated the black employees differently than they treated the white employees.  The white employees were allocated the easier job while the black employees were made to perform the dirtier, harder jobs. This discrimination had gone on for years despite complaints by Ms. Thompson and other African-American employees.

Mr. Savanick encouraged Ms. Thompson to write up the black employees, but handled the non-black employees himself.  He would not allow Ms. Thompson to discipline the white employees or allow her to evaluate them.  She was only permitted to implement discipline to the black employees and prepare their evaluations.  Mr. Savanick constantly found fault with Ms. Thompson even when others complimented her on what a good job she had done.  The harassment interfered with Ms. Thompson's work performance as Mr. Savanick undermined Ms. Thompson's authority as a supervisor and  refused to back her up when the white employees refused to perform their assigned jobs.  Finally, Ms. Thompson was terminated because of her

19

race. The evidence accordingly demonstrates the existence of genuine issues of material fact as to Plaintiff's hostile workplace claim.

### D. Defendants Retaliated Against Ms. Thompson.

Defendants retaliated against Ms. Thompson for having complained about the racially discriminatory practices in UH's Nutrition Services Department. A claimant establishes a *prima facie* case of retaliation by demonstrating (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) there was a causal connection between the protected activity and the adverse employment action. *Williams v. Nashville Network and Gaylord Entertainment Co.*, 132 F.3d 1135 (6th Cir. 1997).

Ms. Thompson complained numerous times to Mr. Bennett and HR Manager Martha Newman about the racial discrimination directed against her and other black employees. The evidence establishes Mr. Savanick's retaliatory intent when dealing with employees who complained about him. He labeled Ms. Thompson a "trouble maker" as he did the other black employees who had complained regarding his racially discriminatory conduct. He instructed Mr. Hart to "get rid of" those same employees. He treated Mr. Hart abusively after Mr. Hart complained to Mr. Bennett about how the employees were treated. These factors and the brief time span between the time Sodexho took over the Department during which Ms. Thompson constantly complained and the time of Ms. Thompson's termination requires the inference that Ms. Thompson's termination was retaliatory, raising a genuine issue of material fact as to Plaintiff's retaliation claim.

### E. Defendants Violated the FMLA.

The FMLA prohibits an employer from interfering with an eligible employee's exercise of the right to unpaid leave for his or her serious health condition. The Act provides such an

employee the right to be restored upon her return to work to the same or equivalent position. *Grace v. USCAR*, 521 F.3d 655 (6th Cir. 2008), *citing* 29 U.S.C. §2614. UH and Sodexho, as joint employers, interfered with Ms. Thompson's right to be restored to her position after she returned to work when they eliminated her position and replaced her with someone performing essentially the same job responsibilities.

### 1.   UH and Sodexho Were Joint Employers.

Sodexho, in managing UH's Nutrition Services Department, acted directly in the interest of UH to provide food service to the hospital's patients, visitors, and personnel. UH and Sodexho shared control of the Department's employees. As such, Sodexho and UH are joint employers for the purposes of the FMLA and are each liable under the Act.

The Sixth Circuit explained in the concept of joint employment as it relates to the FMLA in *Grace, supra.* The *Grace* court noted that the principle of joint employment liability is applicable when two or more businesses exercise some control over the work or working conditions of the employee. A joint employment relationship may exist where the employers are separate and distinct entities with separate owners, management, and facilities. 29 C.F.R. § 825.106(a).

The Code of Federal Regulations sets forth three circumstances where joint employment will generally be considered to exist: "(1) where there is an arrangement between employers to share an employee's services or to interchange employees; (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer. 29 C.F.R. §

825.106(a); *Grace supra*. Whether a joint employment relationship exists is not determined by any one factor. Rather, the employment relationship is to be viewed in its totality. 29 C.F.R. § 825.106(b).

Viewed under the totality of the circumstances, and taking into consideration factors (2) and (3), UH and Sodexho had a joint employment relationship. Sodexho acted directly in the interest of UH by managing its Nutrition Services Department. Sodexho tailors its services to meet each hospital's needs, provides managers to supervise the Nutritional Services departments it manages, and did so with respect to UH. (Bucciarelli Affidavit filed under seal as Ex. A to Sodexho's Motion for Summary Judgment).

Further, UH and Sodexho shared control over Ms. Thompson (and the other UH Nutrition Services employees) in that Sodexho was controlled by UH its dealings with UH Nutrition Services personnel. Sodexho General Manager Mary Henefeld reported directly to the UH Director of Finance and Support Services Kris Bennett with regard to everything regarding Sodexho's function at UH. (Henefeld Depo. at 22). Sodexho could discipline, write up, or terminate UH employees, but could do so only with the agreement of UH's HR Department. UH could see to it that Sodexho's employees were disciplined or terminated. In addition, Sodexho was bound by UH's discrimination policy. (Bennett Depo. at 38-42).

While the Regulations make a distinction between primary and secondary employers, both types of employers are liable for interfering with the rights and benefits provided an employee under the Act. *Grace, supra*; 29 C.F.R. § 825.106 (d); 29 C.F.R. 825.220(a)(1). UH and Sodexho are each subject to liability for interfering with Ms. Thompson's rights under the FMLA.

### 2. Defendants Interfered with Ms. Thompson's Rights Under the FMLA.

Under the FMLA Ms. Thompson had the right to be restored to her position upon her return to work. Defendants interfered with that right by engineering her termination.

29 U.S.C. § 2614(a) provides generally that an eligible employee returning from FMLA leave "shall be entitled ... to be restored by the employer to the position of employment held by the employee when the leave commenced; or to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." The Act makes it unlawful for an employer to interfere with any right provided under the Act, including the right to be restored to one's position. 29 U.S.C. § 2615(a)(1). To establish a claim for interference, the plaintiff must prove: (1) she was an eligible employee; (2) the defendant was an employer; (3) the employee was entitled to FMLA leave; (4) the employee notified the employer of her intent to take FMLA leave; (5) the defendant denied her FMLA benefits or interfered with the FMLA rights to which she was entitled. *Hoge v. Honda of Amer. Mfg., Inc.*, 384 F.3d 238 (6th Cir. 2004); *Killian v. Yorozu Automotive Tennesee,Inc.*, 454 F.3d 549 (6th Cir. 2006); *Grace, supra.*

The fact that Plaintiff meets the first four elements required to prove an interference claim is not in dispute. Defendants, however, contend that they have not violated any right owed to Ms. Thompson under the FMLA. In failing to restore Ms. Thompson to her position, her right to such restoration was clearly violated.

Interference with an employee's right to reinstatement is not a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights. If the employer offers such a reason, the employee may rebut it by a preponderance of the evidence. *Grace,* supra; *Wexler v.*

23

*White's Fine Furniture,* 317 F.3d 564 (6th Cir. 2003).  As discussed above, Defendants' reasons for terminating Ms. Thompson are pretextual and are not the real reasons for her termination.

Substantial evidence shows that Defendants violated Ms. Thompson's rights under RC 4112, 42 U.S.C. § 1981, and the FMLA, creating genuine issues of material fact with respect to each of Plaintiff's claims.  Defendants are therefore not entitled to summary judgment.

## IV.    CONCLUSION

Accordingly, for all of the foregoing reasons, Plaintiff, Aleather Thompson, respectfully requests that this Honorable Court deny Defendants' Motions for Summary Judgment.

Respectfully submitted,


/s/ Sandra J. Rosenthal
SANDRA J. ROSENTHAL, ESQ. (0040215)
75 Public Square, Suite 1300
Cleveland, OH 44113
(216) 696-9936
Fax (216) 621-9640
E-mail br25423@aol.com

/s/ David A. Forrest
DAVID A. FORREST, ESQ.  (0006673)
JEFFRIES, KUBE, FORREST &
MONTLEONE CO., L.P.A.
1650 Midland Building
101 Prospect Avenue, West
Cleveland, OH 44115-1027
(216) 771-4050
Fax (216) 771-0732
E-mail dforrest@jkfmlaw.com

Attorneys for Plaintiff
Aleather Thompson

24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of **Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment** was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,


/s/David A. Forrest
DAVID A. FORREST (0006673)
JEFFRIES, KUBE, FORREST &
MONTELEONE CO., L.P.A.
1650 Midland Building
101 Prospect Avenue West
Cleveland, OH  44115-1027
(216) 771-4050
e-mail jkfmlaw@earthlink.net

Attorney for the Plaintiff