**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **ALEATHER THOMPSON,** | ) | **CASE NO.  1:07 CV 783** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **UHHS RICHMOND HEIGHTS** | ) | |
| **HOSPITAL, INC., et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |

This matter is before the Court on the Motions for Summary Judgment filed by

Defendants Richmond Heights Hospital, Inc. (Docket #46), and Sodexho Management, Inc. and

Steve Savanick (Docket # 47).  Pursuant to Rule 56 of the Federal Rules of Civil Procedure,

Defendants petition the Court for summary judgment as to all of Plaintiff, Aleather Thompson's

("Ms. Thompson") claims.

In her Amended Complaint, Ms. Thompson sets forth four claims for relief.  First, Ms.

Thompson alleges that Defendants violated the Family Medical Leave Act ("FMLA"), 29

U.S.C.§ 2601 et seq., by refusing to restore her to her position at UHHS Richmond Heights

Hospital upon returning from her FMLA leave.  Second, Ms. Thompson alleges that Defendants

discriminated against her on the basis of her race, in violation of Ohio Rev. Code Section 4112.

Ms. Thompson asserts that African American employees were treated differently than white

employees; disciplined differently than white employees; required to perform more difficult,

"dirtier" jobs than white employees; and, that her work was scrutinized excessively, thereby creating a hostile work environment.  In addition, Ms. Thompson asserts that she was replaced by a less qualified white person.  Third, Ms. Thompson alleges that the termination of her employment was retaliatory, in violation of Ohio Rev. Code Section 4112, asserting that her complaints about race discrimination to Defendant UHHS Richmond Heights Hospital resulted in her termination.  Fourth, Ms. Thompson alleges that Defendants violated 42 U.S.C. § 1981 in terminating her because of her race and terminating her because she opposed the alleged racial discrimination in her workplace.

For the reasons set forth below, Defendants' Motions for Summary Judgment are GRANTED.

## FACTUAL BACKGROUND

**I.      Employment with Richmond Heights Hospital.**

Ms. Thompson was hired by Richmond Heights Hospital ("the Hospital") in April 1982 as a Production Cook in the Nutritional Services Department.  (Brief in Opposition of Plaintiff Aleather Thompson ("Brief in Opposition") at p. 2.)  The Hospital is one of the community hospitals associated with the University Hospitals Health System ("UHHS").  Prior to her employment, in January 1980, Ms. Thompson completed a course in food service sanitary management sponsored by the Environmental Health Administration for the State of Maryland and, in May 1980, she received certification from the Baltimore International Culinary Arts Institute.  (Id. at pp. 1-2.)  During her employment with the Hospital, Ms. Thompson received training from the Cuyahoga County Board of Health on "Person in Charge" food safety; training on HIPAA security regulations; and, training on how to educate employees on the chemicals used in the Nutritional Services Department.  (Id. at p. 2.)  Ms. Thompson was employed by the

Hospital for more than twenty-three years.  (Motion for Summary judgment of Defendant UHHS Richmond ("Richmond MSJ") at pp. 5-6.)

**A.      Job Responsibilities.**

The Nutritional Services Department provides food service to visitors, employees, and patients.  (Id. at pp. 3-4.)  As a Production Cook, Ms. Thompson supervised cooks in the kitchen, which she states included scheduling, performing evaluations, and implementing discipline. (Brief in Opposition at p. 2.)  Ms. Thompson states that she was responsible for food production in the hospital kitchen and cafeteria; catered functions; menu planning; following sanitation guidelines; training cooks; assisting the Executive Chef with display cooking; and, assisting with inventory, ordering and receiving.  (Id.)

In approximately 2001, Ms. Thompson was promoted to Food Production Supervisor. (Id.)  Ms. Thompson states that she supervised the kitchen and cafeteria; set-up, cooked and served at catered functions; planned menus; ensured compliance with sanitary guidelines; trained kitchen and cafeteria staff; and, did display cooking.  (Id. at p. 3.)  Ms. Thompson also did scheduling; performed evaluations; did inventory, ordering and receiving; and, was responsible for some discipline.  Ms. Thompson planned and put on holiday and "themed" food events and created food event calendars.  (Id.)  Ms. Thompson handled cash responsibilities when her supervisor was not on site.  (Id.)

**B.      Performance Evaluations.**

On a scale from 1-3, with 1 designated as "improvement needed/unsatisfactory," 2 designated as "meets expectations," and 3 as "exceeds expectations," Ms. Thompson received ratings in her position as Food Production Supervisor from 2.1 to 2.85.  (Id.)  Ms. Thompson was

recognized as a Service Superstar in March 2001 and July 2002.  (Id. at p. 4.)  Ms. Thompson

was praised by her Aramark Manager Jim Johnston.  (Id.)

       **C.**       **Food Service Management - Aramark to Sodexho.**

      At all times relevant to the Complaint, Richmond employed third-party food service

contractors in its Nutritional Services Department.  (Richmond MSJ at p. 4; Thompson Depo. at

pp. 96-97.)  The third-party contractors managed the food service.  (Id.)

      In 2004, Sodexho Management sought the opportunity to provide food service

management to UHHS and its community hospitals.  (Richmond MSJ at p. 4; Motion for

Summary Judgment of Defendants Sodexho and Savanick ("Sodexho MSJ") at p. 3.)  At that

time, Aramark was the third-party contractor managing the Nutritional Services Department.

(Richmond MSJ at p. 4; Sodexho MSJ at p. 5.)

      In May 2004, Sodexho conducted a site visit of the Hospital's Nutritional Services

Department to evaluate the Hospital's needs and to gather information in order to prepare a

service proposal.  (Sodexho MSJ at p. 3.)  District Manager Bob Bucciarelli participated in the

site survey of the Hospital.  (Id.)  Sodexho then prepared a Costing Analysis for the Hospital,

which included its Proposal for the services that Sodexho could render and a suggested staffing

model.  (Id.)

      In the Analysis, Sodexho suggested a reduction in the Hospital's employee hours for the

Nutritional Services Department staff.  (Id.)  It proposed that the Hospital employ no supervisors

or managers.  (Id.)  Sodexho would employ the only managers - a General Manager and a Chef

Manager.  (Id.)  The position of Food Production Supervisor, Ms. Thompson's position, was not

included in the Proposal.  (Id.)  At the time Sodexho presented its Proposal, Mr. Bucciarelli had

not met Ms. Thompson and did not know her race or FMLA status. (Id.)

Along with the foregoing, Sodexho planned to institute an At-Your-Request food service program for Hospital patients, allowing patients to order from a menu for immediate delivery at any time, rather than selecting meals on pre-set menus and having a single delivery time. (Sodexho MSJ at p. 3.)

The Hospital accepted Sodexho's proposal and Sodexho began servicing the Hospital in June 2005. (Id. at p. 4.) Sodexho was required to supervise the Nutritional Services Department operations, including the Nutritional Services Department staff. (Id.) Sodexho had no authority to hire, discharge or discipline the Nutritional Services Department staff without the Hospital's involvement and consent. (Id.) The Hospital was also responsible for processing and making decisions related to employee leave and retained full responsibility for benefit administration for its employees. (Id.)

Mary Henefeld, a Sodexho employee, was assigned as the General Manager. She split her time between the Hospital, and Bedford Heights Hospital, another facility in the UHHS. (Id.) Ms. Henefeld was responsible for supervising the Nutritional Services Department staff, including supervising the Sodexho and Hospital employees; ensuring budgetary compliance; and, conducting performance evaluations. (Id.) Ms. Henefeld reported to Sodexho; to the Hospital's human resources group; and, to Kris Bennett, the Hospital's Director of Finance and Support Services.[1] (Id.)

---

[1]

When Aramark managed University Hospital's Nutritional Services Department, Aramark employee Eric Kottheimer managed the Department. He reported to University hospital's Chief Operating Officer and later reported to University Hospital's Director of Finance and Support Services, Kris Bennett. Aramark employee Jim Johnston subsequently replaced Mr. Kottheimer.

Steve Savanick, a Sodexho employee, was assigned to the Hospital as an Executive Chef. Mr. Savanick has been employed by Sodexho since 1995.  (Id. at p. 2.)  As an Executive Chef, he was responsible for menu planning; food purchasing; employee scheduling; and, food production.  Mr. Savanick reported to Ms. Henefeld.  Ms. Thompson reported to Mr. Savanick. When Ms. Henefeld was absent, issues were directed to Mr. Savanick.  (Id.)  Mr. Savanick then either dealt with any issues himself, or referred the matter to Ms. Henefeld.  (Id. at p.4.)  Both Henefeld and Savanick had contact with the Hospital's Human Resources Department regarding disciplinary matters, policies and procedures.  Mr. Savanick did not have authority to make hiring or firing decisions for Hospital employees.  (Id. at p. 2.)  However, he did participate in discussions regarding staffing for the Nutritional Services Department and the elimination of Ms. Thompson's position.  (Id.)

Ms. Henefeld testified that Ms. Thompson's responsibilities included opening the kitchen; recording temperatures; covering call-offs; handling routine day-to-day issues; some ordering; and, assisting with catering.  Ms. Thompson's scheduling duties were reassigned to Mr. Savanick.  (Deposition of Mary Henefeld at pp. 26-27.)

Sodexho also employed a clinical dietician on site.  (Brief in Opposition at p. 4.) University Hospitals employed the rest of the staff in the Department.  (Id.)

**D.      Claims of Discrimination-Aramark.**

Ms. Thompson claims that during Aramark's management of the Nutritional Services Department, prior to the time Sodexho replaced Aramark, there were numerous instances of racial discrimination about which she, and other black employees, complained.  (Id. at p. 5.)

-6-

Specifically, Ms. Thompson states that she complained about Aramark manager Eric Kottheimer (that he gave easier jobs to the white employees; that black employees were disciplined more often; that easier tasks were assigned to white employees; and, that he did not respect her).  (Id.) There was also an incident when Mr. Kottheimer hung a civil war poster depicting African-Americans as slaves in the hall outside the cafeteria.  (Id.)  As a result of the complaints, University Hospitals requested that Mr. Kottheimer be replaced.  (Id.)

Mr. Kottheimer was replaced with Jim Johnston.  (Brief in Opposition at p. 6.)  Ms. Thompson made many of the same complaints against Mr. Johnston regarding the treatment of African-American employees.  (Id.)  In the summer of 2004, Ms. Thompson told the Hospital that Mr. Johnston reduced staff hours, and believed that the action could be racially motivated. (Id.)  Ms. Thompson states that she complained to Kris Bennett about the perceived racial discrimination and told him "she had trouble communicating with Mr. Johnston."  (Id.)  Ms. Thompson alleges that Mr. Bennett informed her that if she was unable to perform as a supervisor, she should step down.  (Id.)

In response to her complaints, however, the Hospital conducted an investigation to determine whether there was unfairness in job duty distribution.  (Richmond MSJ at p. 6.)  The investigation included interviewing every member of the Nutritional Services Department.  (Id.; Deposition Martha Newman, Human Resources Manager, at pp. 36; 85-88.)  The Hospital concluded that there was at most a perceived unfairness in job duty distribution, but implemented a plan to divide and/or redistribute responsibilities and to improve communication. (Id.)

Despite the previous complaints, Ms. Thompson testified that she and Mr. Johnston

successfully worked together to resolve the issue of employee morale.  However, Ms. Thompson

asserts that the discrimination did not stop.  (Brief in Opposition at p. 6.)

     **E.**     **Claims of Discrimination - Sodexho.**

     As stated above, Sodexho assumed management of the Nutritional Services Department

in June 2005.  UHHS and the Hospital maintain written anti-harassment and non-discrimination

policies.  (Richmond MSJ at p. 5.)  As a contractor for the Hospital, Sodexho was obligated to

follow those policies.  (Id.)

     Ms. Thompson claims that the instances of racial discrimination increased when Sodexho

began managing the Department.  (Brief in Opposition at p. 6.)  Ms. Thompson alleges that Mr.

Savanick gave white employees preferential treatment; that black employees were required to

perform the harder, dirtier jobs; and, that certain white employees "called off all the time,"

refused to perform jobs assigned by Ms. Thompson, talked back to Ms. Thompson and were not

disciplined.  (Id. at p.7.)  Ms. Thompson asserts that black employees would have been

disciplined or terminated for the same behavior.  (Id.)

     Ms. Thompson states that black employees expressed concerns to her about

discriminatory treatment and that she approached Mr. Savanick about unequal job allocation, but

did not receive a satisfactory response.  (Brief in Opposition at p. 8.)   Ms. Thompson asserts

that she met with Human Resources Manager Martha Newman and Kris Bennett regarding the

perceived discrimination.  (Id.)  Ms. Thompson alleges that her complaints were not investigated

and, that despite the complaints that she and others have made, University Hospitals and

Sodexho have permitted Mr. Savanick to "persist in his discriminatory conduct."  (Id.)

     Aside from a complaint she made to Ms. Henefeld that Mr. Savanick lacked effective

communication skills and did not help in the kitchen, neither Sodexho nor the Hospital have any record of complaints by Ms. Thompson of discriminatory conduct by Mr. Savanick.  (Richmond MSJ at p. 6; Affidavit of Nancy Scheafnocker at ¶ 4.)  Neither Mr. Bennett nor Ms. Newman recall Ms. Thompson making any allegations of racial discrimination relating to Sodexho or Mr. Savanick during this time period, but do recall the other complaints Ms. Thompson made during her employment.  (Id.; Deposition of Martha Newman at p. 50; Deposition of Kris Bennett at p. 82.)  The former Human Resources Manager Ms. Newman testified that she did not receive complaints about Mr. Savanick or Sodexho during the time period in question.  (Id.; Deposition of Martha Newman at pp. 92-93.)

In addition to the above, Ms. Thompson asserts that Mr. Savanick's treatment of her reflected his racial prejudice.  (Id. at p. 7.)  Ms. Thompson states that he did not permit her to evaluate or discipline white employees.  (Id.)  Further, Ms. Thompson states that he treated her poorly and disrespectfully; did not want to communicate with her; and, never backed her up with regard to supervision of the employees.  Ms. Thompson alleges that Mr. Savanick constantly found fault with her, even when others would compliment her work.  (Id. at p. 9.)

Finally, Ms. Thompson alleges that Mr. Savanick gave her a poor written evaluation, a rating of 1.2, which he changed to a 2.2 after she complained and received a compliment from someone else for a job she had done.  (Id.)  Ms. Thompson asserts that she had already received an evaluation and that to issue an evaluation at this time was unusual and inappropriate.  (Id.)  The evaluation was not signed or dated.  (Id.)

Mr. Savanick testified that he had concerns about Ms. Thompson's performance, including ordering and scheduling problems.  (Deposition of Steve Savanick at p. 77.)  Ms.

-9-

Thompson states that she complained about the evaluation, and about a conversation she had

with Mr. Savanick, to Mary Henefeld, who in response drafted a memo that was placed in her

personnel file.[2]  (Id.)  The memo relates that Ms. Thompson was angry about a conversation she

had with Mr. Savanick regarding her job performance.  The performance issues discussed

included communication; scheduling; and, ordering.  Race was not discussed.  (August 12, 2005

Memo, Exhibit F to Ms. Thompson's Brief in Opposition.)

     **F.**        **Elimination of Ms. Thompson's Position.**

     On or around August 16, 2005, Ms. Henefeld prepared a memorandum entitled

"Proposed Staffing Changes."  (Brief in Opposition at p. 10.)  The Memo was addressed to Kris

Bennett, and stated that it was from "Mary & Steve."  (Memorandum, Exhibit 4 to the

Deposition of Steve Savanick.)  In the Memo, Ms. Henefeld made recommendations to Mr.

Bennett regarding staffing.  (Id.)  The Memo reads, in pertinent part, as follows:

     Kris,

     In preparation for budget season, cafeteria renovations, and At Your Request
     Room Service, we have modified the existing Nutrition Services staffing plan to
     better meet the needs of our patients, visitors and hospital staff.

     The highlights are as follows:
           •     Total department FTE's drop from 19.84 to 19.04.
           •     Eliminate the Nutrition Supervisor position[3] and replace with a
                 Sodexho Chef 1 (entry level management position).  This person
                 would work 10:30 - 7:30 M-F and be responsible for cook training,

---

[2]

     Ms. Thompson alleges that in response to her complaint regarding the evaluation,
Ms. Henefeld referenced "unsubstantiated" complaints by an employee from 2004 about
Ms. Thompson regarding ordering and favoritism.  Ms. Thompson asserts that these
complaints had already been addressed and resolved by Ms. Thompson, Jim Johnston,
and the Human Resources Manager.  Ms. Thompson argues it was inappropriate for Mary
Henefeld to "dredge up" these complaints.  (Brief in Opposition at pp. 9-10.)

[3]

     The memo refers to Ms. Thompson's position as the "Nutrition Supervisor
position."

> cafeteria and patient food presentation, HACCP, diplay cooking
> and Room Service implementation from a production standpoint.
> They would for the cafeteria cash collection currently being
> completed by the hostesses.  This is modeled after the program that
> was implemented at main campus UHC.
> •    Close the Richmond Roast permanently and relocate the flower
> concession to the cafeteria.  (Currently, the program runs at an
> approximately 18K deficit).

(Id.)

Closure of Richmond Roast included the elimination of the kiosk hostess job held by

Sandy Stull, a white female.[4]  In addition to the above, the memo also stated that cafeteria hours

would be expanded; that the Clinical Dietician would be transferred from Bedford to the

Hospital permanently; that the diet office would be relocated to facilitate the Room Service

implementation process; that a morning porter position would be added to put away stock; and,

that a second cafe person would be added for breakfast made-to-order cooking, breakfast baking

and to prep "Grab-n-Go" items.  (Id.)

As set forth above, the memo discussed eliminating the position held by Ms. Thompson,

as was contemplated by Sodexho's original proposal.  The memo recommended the creation of a

new position, Chef 1.  (Id.; Sodexho MSJ at p. 6.)  Ms. Henefeld testified that Sodexho needed

more cook training, rather than a Department supervisor.  (Deposition of Mary Henefeld at p.

57.)   Sodexho expected Chef 1 to train and supervise cooks from a production manager

perspective and to implement and ensure proper operation of the At-Your-Request program.

(Id.)  In addition, Chef 1 was responsible for standardizing food quality; ensuring uniform recipe

compliance for food consistency; cooking in the cafeteria; collecting cash; and, some purchasing.

---

[4]    Ms. Stull was hired in a different position with the Hospital.

-11-

(Id.)  Chef 1 did not have responsibility to schedule, discipline or evaluate the Nutritional Services Department staff employed by the Hospital.  (Id.)

Ms. Thompson claims that these are basically the same responsibilities she had, with the exception of the evening schedule and scheduling.  (Brief in Opposition at p. 10.)

Sodexho posted the Chef 1 position in late August 2005.  (Sodexho MSJ at p. 6; Brief in Opposition at p. 11.)  The position was posted through Sodexho's national website.  Applications were submitted through a recruiter who pre-screened applicants and sent the most viable candidates for interview.  (Henefeld Depo. at p. 64.)  Ms. Thompson did not apply.  (Id.)  Ms. Thompson testified that she was unaware the new position was posted, and because she was unaware that her position would be eliminated would not have known to apply.  (Brief in Opposition at p. 11.)  Sodexho completed its hiring process in early October 2005 and offered the position to Jack Hart, a white male.  (Sodexho MSJ at p. 6.)

**G.  Ms. Thompson's FMLA Leave.**

Ms. Thompson took an approved FMLA leave from October 22, 2005 through November 1, 2005.  (Brief in Opposition at p. 12.)  She was originally scheduled to return to work on November 1, 2005, but was unable to do so.  (Id.)  She returned to work on November 2, 2005 with paperwork supporting her request for an extension of FMLA leave for that day.  (Id.)

**H.  Ms. Thompson's Termination.**

When she returned to work on November 2, 2005, Ms. Thompson was called into a meeting with Martha Newman, the Human Resources Manger, Mr. Bennett and Mr. Savanick.  (Brief in Opposition at p. 12.)  Ms. Thompson was informed that her position had been eliminated.  (Id.) Ms. Thompson asserts that there was no discussion as to whether she could

-12-

apply for other positions at the Hospital or with Sodexho.  (Id.)  Ms. Newman testified that she

told Ms. Thompson she could apply for other jobs with the hospital.  (Deposition of Martha

Newman at p. 112.)

> ### I.      Chef 1 Position.

Following Ms. Thompson's termination, Mr. Hart was hired for the position of Chef 1.

(Id.)  Mr. Hart was employed directly by Sodexho.  (Deposition of Kris Bennett at p. 82.)  Ms.

Thompson alleges that Mr. Hart replaced her, and that he was unqualified for the Chef 1 position

because he could not perform ordering due to a learning disability; lacked formal culinary

certification; and, had less experience than Ms. Thompson.[5]  (Id.)  In addition to the above, Ms.

Thompson submits affidavits in support of her assertion that the Nutritional Services Department

was run more effectively when she was employed.

### II.     Motions for Summary Judgment.

On July 3, 2008, Defendants filed their Motions for Summary Judgment.  (Docket #s46

and 47.)  Defendants assert that Ms. Thompson has not presented evidence to the Court

sufficient to support any of her claims and, therefore, that they are entitled to judgment as a

matter of law.  On August 4, 2008, Ms. Thompson filed her Brief in Opposition to Defendants'

Motions for Summary Judgment.  (Docket #55.)  Defendants filed their Reply Briefs on August

18, 2008.  (Docket #s 57 and 58.)

---

[5]

> Ms. Thompson claims that after her employment ended, Mr. Savanick told Mr.
> Hart that she was a trouble maker.  Ms. Thompson also claims that after her employment
> ended, Mr. Savanick told Mr. Hart to "get rid" of three black employees because they
> were also trouble makers.  Ms. Thompson claims that Mr. Hart complained about Mr.
> Savanick to Kris Bennett which caused Mr. Savanick to "increase his abuse" of Mr. Hart.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citations omitted).

-14-

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  The nonmoving party may not simply rely on its pleadings, but must "produce

evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't*

*of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing that there is
> a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as

an automatic grant of summary judgment, where otherwise appropriate.  *Id.*

Though parties must produce evidence in support of and in opposition to a motion for

summary judgment, not all types of evidence are permissible.  The Sixth Circuit has concurred

with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered

by the trial court in ruling on a motion for summary judgment.'"  *Wiley v. United States*, 20 F.3d

222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181

(9th Cir. 1988)).  FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be
> made on the basis of personal knowledge, set forth admissible evidence, and show
> that the affiant is competent to testify.  Rule 56(e) further requires the party to
> attach sworn or certified copies to all documents referred to in the affidavit.
> Furthermore, hearsay evidence cannot be considered on a motion for summary
> judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted).  However, evidence not meeting this standard may

be considered by the district court unless the opposing party affirmatively raises the issue of the

defect.

-15-

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## DISCUSSION[6]

**I.    Ms. Thompson's Discrimination Claims.**

Ms. Thompson claims that she was terminated because of her race, African-American; that African-American employees were treated less favorably in the Nutritional Services

---

[6]    The Court has thoroughly and exhaustively reviewed the Amended Complaint, in conjunction with the Briefs submitted by the Parties and the documentation and depositions filed in support thereof.  The Court has extracted each of the claims which Ms. Thompson appears to assert and has analyzed each separately.

Department; and, that she was subject to a racially hostile work environment.

>    **A.    Termination on the basis of race.**

Title VII prohibits employers from discriminating against employees on the basis of race. 42 U.S.C. § 2000e.  The Supreme Court of Ohio has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq*., Title 42, is generally applicable to cases involving alleged violations of OHIO REV. CODE ANN. § 4112."  *Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196 (1981).  Thus, the Court's consideration of federal case law applies equally to Plaintiff's state and federal claims.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (stating that the district court correctly "lumped together" plaintiff's Title VII and Ohio state law theories of discrimination).

Where the plaintiff does not have direct evidence of discrimination, courts use a burden-shifting approach. The Supreme Court explained:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804 (1973)).

"It is well established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citations omitted).  To establish a prima facie case of race discrimination under *McDonnell Douglas* and *Burdine,* a plaintiff must prove that (1) he is a member of a protected

class; (2) he was qualified for the job; (3) he experienced an adverse employment action; and (4) he was replaced by a person outside the protected class or he was treated differently than a similarly situated non-protected employee. *See Newman v. Federal Express Corp.,* 266 F.3d 401, 406 (6th Cir. 2001) (citing *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995)).

Ms. Thompson has not presented direct evidence that she was discriminated against based on her race. (Thompson Depo. at p. 174.) Accordingly, the Court must analyze her claims under the burden-shifting framework outlined above.

### 1. Ms. Thompson was not replaced.

Ms. Thompson has failed to present evidence that she was replaced by a person outside the protected class, the fourth requirement of the prima facie case. Ms. Thompson asserts that she was replaced by Jack Hart, a white employee, because as Chef 1 he performed what she believes are the same job duties as she had while employed as Food Production Supervisor.

The evidence before the Court establishes that the recommendation to eliminate the Food Production Supervisor position was first made in 2004, when Sodexho submitted its management proposal to the University Hospitals Health System in an effort to become the third-party contractor for food service management at the Hospital. The Proposal suggested that the Hospital employ no supervisors or managers in the Nutritional Services Department. Sodexho would employ the only managers - - a General Manager and a Chef Manager. Sodexho's Proposal was made by Bob Bucciarelli, District Manager for Sodexho, who at the time had no knowledge of Ms. Thompson, her race, or her intention to take FMLA leave. Neither Mr. Savanick nor Ms. Henefeld had any involvement with the preparation of the Proposal by Mr.

-18-

Bucciarelli.

As set forth above, the Sodexho Proposal contemplated the elimination of Ms. Thompson's position one year prior to Sodexho's start at the Hospital in June 2006.  Two months after Sodexho assumed management responsibilities, in August 2006, a memo was prepared by Mary Henefeld to Kris Bennett, suggesting that the Food Production Supervisor position be eliminated, as was previously proposed.  The memo suggested creating the Chef 1 position.  The memo also addressed several other issues, as outlined above.  The memo noted that the same changes had been implemented at University Hospital's main campus.

The Chef 1 position involved some of the same responsibilities that Ms. Thompson had during her employment.  However, Ms. Thompson's position was a general, supervisory position, with responsibilities involving employee scheduling, discipline and evaluation.  The focus of the Chef 1 position was food production, food quality, and the implementation and operation of the At-Your-Request program.  This program did not exist during Ms. Thompson's employment with University Hospitals.  Unlike the Department Supervisor position held by Ms. Thompson, Chef 1 was not responsible for scheduling, evaluating employees or disciplining employees.  Chef 1 was hired to train cooks, rather than supervise the Department.

Based on the foregoing, there is insufficient evidence upon which a reasonable person could find that Ms. Thompson was replaced by Mr. Hart.  Accordingly, she has failed to establish her prima facie case and Defendants are entitled to summary judgment as a matter of law.

-19-

2.      No evidence of pretext.

In addition to the above, had Ms. Thompson satisfied her burden to present a prima facie

case of discrimination, she has not established that the proffered reason for the elimination of her

position is a pretext for discrimination.  "An employee can show pretext by offering evidence

that the employer's proffered reason had no basis in fact, did not actually motivate its decision,

or was never used in the past to discharge an employee."  *Smith v. Chrysler Corp.*, 155 F.3d 799,

805-06 (6th Cir. 1998).  "In order to prove pretext, therefore, the plaintiff must introduce

admissible evidence to show that the proffered reason was not the true reason for the

employment decision and that discriminatory animus was the true motivation driving the

employer's determination."  *Grace v. USCAR*, 521 F.3d 655, 677-78 (6th Cir. 2008).  Ms.

Thompson has not satisfied her burden.

The evidence before the Court shows that Sodexho's proposal for managing the hospital,

which was submitted prior to contracting with University Hospitals, contemplated the

elimination of the Food Production Supervisor position.  There is no evidence to the contrary.

Further, there is no evidence that the management proposal offered by Sodexho did not actually

motivate its decision to eliminate the position.  There is no evidence upon which a reasonable

person could find that the department restructuring proposed by Sodexho was not the true reason

for elimination the Food Production Supervisor position, and no evidence that the position was

eliminated as a result of discriminatory animus toward Ms. Thompson.

Ms. Thompson argues that "the evidence showing that Mr. Savanick treated Ms.

Thompson disrespectfully and poorly, that he found fault with her constantly, and undermined

her authority with the other employees raises a strong inference that Defendants' proffered

-20-

reasons are false."  "Mere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination."  *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997).  Simply put, while Ms. Thompson may have felt Mr. Savanick treatment of her, or her termination, was unwarranted, there is nothing which links that treatment to a discriminatory motive.  The evidence presented, viewed in its totality, fails to rebut the legitimate, non-discriminatory reason proffered by Defendants for eliminating the position.

Ms. Thompson also argues that the original Proposal submitted by Sodexho was only a "guide map" and was not followed in every respect once Sodexho assumed management. Therefore, Ms. Thompson asserts that Defendants' reliance on the original Proposal as the basis for the elimination of her position is a pretext for discrimination, as the Hospital was not required to eliminate her position.  However, the fact that certain changes were made as a result of the Sodexho business Proposal, and others were not, does nothing to establish that Defendants did not actually rely upon the Proposal in eliminating the Supervisor position held by Ms. Thompson.  Further, there is no evidence from which it could be inferred that decisions made to adhere to or deviate from the original Proposal were the result of discriminatory animus on the part of Defendants.  Accordingly, this argument is without merit.

Finally, Ms. Thompson points to a statement allegedly made by Mr. Savanick to Mr. Hart, that Ms. Thompson was a trouble maker, as evidence of pretext.  The statement was made after Ms. Thompson's employment ended.  This statement does nothing to rebut the assertion Sodexho's business restructuring was the motivation for the elimination of Ms. Thompson's position.  Further, this statement does nothing to show a discriminatory animus on the part of

Mr. Savanick.[7]

The Court finds that Ms. Thompson has failed to establish pretext.  Accordingly, Ms. Thompson's claim fails as a matter of law.

**B.      Disparate Treatment.**

As set forth above, to establish a prima facie case of race discrimination under *McDonnell Douglas* and *Burdine,* a plaintiff must prove that (1) he is a member of a protected class; (2) he was qualified for the job; (3) he experienced an adverse employment action; and (4) he was treated differently than a similarly situated non-protected employee.  *See Newman v. Federal Express Corp.,* 266 F.3d 401, 406 (6th Cir. 2001) (citing *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995)).

**1.      Treatment of African-American Employees/Behavior of Mr. Savanick toward Ms. Thompson.**

In her Complaint, Ms. Thompson alleges that African-American employees were treated differently than white employees; disciplined differently than white employees; and, were required to perform more difficult, "dirtier" jobs than white employees.  Ms. Thompson also asserts that the Hospital's Nutritional Services Department allowed the alleged racial discrimination to continue over a period of years.  Ms. Thompson gave very few examples to support these assertions and did not testify that any of this treatment was directed at her.

Ms. Thompson also states that she was only permitted to discipline and/or evaluate black

---

[7]

Ms. Thompson offers the Affidavits of several employees as evidence of discriminatory intent in the Department.  However, the Affidavits discuss events and circumstances in the Department after Ms. Thompson's employment with the Hospital ended, and are therefore irrelevant to this Court's analysis.  More importantly, even taken as a whole, the statements in the Affidavits do not establish that proffered reason for the elimination of Ms. Thompson's position was a pretext for discrimination.

employees and that Mr. Savanick disciplined and/or evaluated white employees.  However, during her deposition, Ms. Thompson stated that the only basis for this claim was the fact that white employees never came to her for discipline, leading her to assume that Mr. Savanick did not send them to her for discipline.  Ms. Thompson testified that she does not know whether African-American employees  went to Mr. Savanick to address work issues.  She also testified that Mr. Savanick did complete evaluations for employees who were not white.

In addition to the above, Ms. Thompson stated that Mr. Savanick did not want to communicate with her; was picking on her personally; was "coming and saying stuff to be saying stuff;" never mentioned anything good she had done; was "real short" with her; "put off the scent of he didn't want to be bothered;" and, did not respect her.  Ms. Thompson stated that she and Mr. Savanick never had a good working relationship and she felt she couldn't please him.  Ms. Thompson believed this was because of her race.

The foregoing is insufficient to support a disparate treatment claim based on race.  Ms. Thompson does not claim that the alleged unequal job allocation and unequal discipline affected her directly, only that she relayed the concerns of other employees to management.  Further, aside from her own self-serving and unsupported statements, there is no evidence to corroborate her claim that she was not permitted to evaluate or discipline white employees.  Further, Ms. Thompson's subjective belief that Mr. Savanick's opinion of her or his behavior toward her was based on her race does not establish that she was treated differently than other, similarly situated, non-African-American employees.  Accordingly, Ms. Thompson's claim fails as a matter of law.

## 2.        The employment of Sandy Stull.

In her Brief in Opposition, Ms. Thompson states that the Hospital "could have requested that Ms. Thompson fill the Chef 1 position and that Sodexho could have placed her in the

position, but they deliberately chose not to do so."  Ms. Thompson discusses the fact that Sandy

Stull, a white employee whose position was also eliminated, was hired in a different capacity by

the Hospital.

To the extent that Ms. Thompson claims that Ms. Stull was treated more favorably

because she obtained a new position in the Hospital after the kiosk position was eliminated, Ms.

Thompson's claim fails as a matter of law.  Ms. Thompson and Ms. Stull were not similarly

situated.  Ms. Thompson was a supervisory employee and Ms. Stull had no supervisory role.

Further, the Hospital and/or Sodexho were not required to offer the Chef 1 position to

Ms. Thompson.  More importantly, there is nothing in the record to support Ms. Thompson's

assertion that the fact she was not offered the Chef 1 position was because she was African-

American, or that Ms. Stull was hired in a different capacity because she was white.

Accordingly, Defendants are entitled to summary judgment on this claim as a matter of

law.

C.     **Hostile Work Environment.**

The protections of Title VII extend to a hostile workplace environment in which " the

workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently

severe or pervasive as to alter the conditions of the victim's employment and create an abusive

working environment."  *Harris v. Forklif Sys., Inc.*, 510 U.S. 17, 21 (1993).  "Conduct that is not

severe or pervasive enough to create an objectively hostile or abusive work environment - - an

environment that at reasonable person would find hostile or abusive - - is beyond Title VII's

purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive,

the conduct has not actually altered the conditions of the victim's employment, and there is no

Title VII violation."  *Id.* at 21-22.

-24-

Under the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, plaintiffs must initially establish a prima facie case of a racially hostile work environment based on coworkers' conduct by showing that: (1) they are members of a protected class; (2) they were subjected to unwelcome racial harassment; (3) the harassment complained of was based on race; (4) the harassment unreasonably interfered with the employees' work performance by creating an intimidating, hostile or offensive work environment; and, (5) the employer is liable for the creation of that environment. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

The alleged harassment must be evaluated based on the totality of the circumstances. *Harris*, 510 U.S. at 23. The Court may consider certain factors in deciding whether a hostile work environment exists, including but not limited to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. 17, at 23.

Ms. Thompson alleges that African-American employees were treated differently than white employees; disciplined differently than white employees; required to perform more difficult, "dirtier" jobs than white employees; and, that her work was scrutinized excessively, thereby creating a hostile work environment. In addition, Ms. Thompson states that she was not permitted to evaluate or discipline white employees. Ms. Thompson stated that Mr. Savanick did not want to communicate with her; was picking on her personally; was "coming and saying stuff to be saying stuff;" never mentioned anything good she had done; was "real short" with her; "put off the scent of he didn't want to be bothered;" and, did not respect her. During her deposition, Ms. Thompson stated that it was the way he treated her that bothered her.

-25-

(Thompson Depo. at p. 238.)

The facts as stated by Ms. Thompson, in their totality, do not establish that her work environment was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment. Ms. Thompson does not claim that the alleged unequal job allocation and unequal discipline of African-American employees and white employees affected her directly, only that she relayed the concerns of other employees in the Nutritional Services Department to management. The claim that she was not permitted to discipline and/or evaluate white employees, or that Mr. Savanick only disciplined and/or evaluated white employees, does not establish that the conditions of employment were sufficiently severe to alter the conditions of her employment. During her deposition, Ms. Thompson stated that she cannot recall any specific facts to substantiate these claims. (Thompson Depo. at pp. 222-230.)

Most important, Ms. Thompson has presented no evidence to substantiate her claim that Mr. Savanick's behavior and/or personal feelings toward her created a workplace "permeated with discriminatory intimidation; ridicule; and insult" that was "sufficiently severe or pervasive as to alter the conditions" of her employment. Even taken as a whole, the actions alleged by Ms. Thompson to create a hostile environment do not rise to the level of severe or pervasive. At most, the evidence shows that Ms. Thompson and Mr. Savanick did not work well together, and that Mr. Savanick was critical of Ms. Thompson's performance. Further, there is no evidence to support her assertion that Mr. Savanick's actions or perceived attitude toward Ms. Thompson were based on her race.

Based on the foregoing, Ms. Thompson has failed to substantiate her hostile work environment claim and Defendants are entitled to summary judgment as a matter of law.

-26-

**II.     Retaliation.**

In order to establish a prima facie case for retaliation, Ms. Thompson must show that she engaged in an activity protected by Section 1981 or Ohio Rev. Code Chapter 4112; that Defendants knew she had exercised her civil rights; thereafter they took an employment action adverse to her; and, that there was a causal connection between the protected activity and the adverse action.  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006).

Ms. Thompson has not presented any evidence of a causal link between her asserted complaints regarding discriminatory treatment of African-American employees, or Mr. Savanick, and her termination.  In her deposition, Ms. Thompson stated that she feels that talking to Mr. Bennett about Mr. Savanick played a role in her discharge, but has no evidence to support this claim.  (Thompson Depo. at p. 179.)  While there is a factual dispute as to whether or not she complained about the perceived discrimination and Mr. Savanick, there is nothing in the record to suggest that complaints led to the elimination of her position.  Further, past complaints she made regarding perceived discrimination, under the management of Aramark, were addressed and investigated.  Simply put, there is nothing to suggest that the position was eliminated, or that her employment was terminated, because of her complaints.  Accordingly, Ms. Thompson's retaliation claim fails as a matter of law.

**III.     Family Medical Leave Act.**

Ms. Thompson alleges that Defendants violated the Family Medical Leave Act ("FMLA"), 29 U.S.C.§ 2601 et seq., by refusing to restore her to her position at the Hospital upon returning from her FMLA leave.  Ms. Thompson does not allege that she was terminated for taking FMLA leave.  Rather, the argument is that the Hospital's alleged racially motivated termination of her employment unlawfully interfered with her exercise of FMLA rights because

-27-

she did not have a position with the Hospital when she returned.

Ms. Thompson cites 29 U.S.C. § 2615(a)(1), asserting that she had a right to be restored to her same position, or an equivalent position, after taking her FMLA leave. Relying on *Hoge v. Honda of Amer. Mfg., Inc*., 384 F.3d 238 (6th Cir. 2004) and *Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549 (6th Cir. 2006), Ms. Thompson argues that she has established a claim for interference with her FMLA rights and that the reasons proffered by Defendants for not returning her to her position as Food Production Supervisor are a pretext for racial discrimination.

29 U.S.C. § 2614(a)(3)(B) provides that an employee has no "right, benefit or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." The evidence before this Court shows that the Food Production Supervisor position held by Ms. Thompson was recommended for elimination in mid-2004, when Sodexho first submitted its proposal to the University Hospitals Health System. The proposal was made by Bob Bucciarelli, who at the time had no knowledge of Ms. Thompson, her race, or her intention to take FMLA leave. Neither Mr. Savanick nor Ms. Henefeld had any involvement with the preparation of the proposal by Mr. Bucciarelli. The recommendation that the elimination of the position be effectuated was made in mid-August 2005, more than a month before Ms. Thompson's FMLA leave commenced. Thus, the evidence presented establishes that even if she had not taken FMLA leave, her position would have been eliminated. Accordingly, Ms. Thompson's claim that Defendants interfered with the exercise of her FMLA rights fails as a matter of law.

In her deposition, Ms. Thompson also stated that she believes she was terminated because she took too much leave. This Court applies the burden shifting analysis set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims under the FMLA. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001) (applying the burden-shifting analysis to an FMLA-retaliation suit)[8]. In order to establish a prima facie case of retaliation for taking FMLA leave, a plaintiff must show that (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and, (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003).

In order to establish a causal connection between the protected activity and adverse employment action, a plaintiff must present evidence "'sufficient to raise [an] inference that her protected activity was the likely reason for the adverse action.'" *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990 (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)). Temporal proximity is insufficient in and of itself to establish causation. *See Nguyen v. City of Cleveland,* 229 F.3d 559, 567 (6th Cir. 2000) (refusing to find that temporal proximity was sufficient in itself to establish a causal connection, and declining to decide "how much evidence in addition to temporal proximity would be required"); *McNett v. Harden Comm. Fed. Credit Union,* 118 F. App'x 960, 965 (6th Cir. 2004) (unpublished) ("[T]he employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation *where the particular circumstances strengthen the inference of causation.")* (emphasis added) (citing *Nguyen*, 229 F.3d at 566).

---

[8]     There is no direct evidence of discrimination/retaliation in this case.

If a prima facie case is established, the defendant must articulate a legitimate reason for its actions.  The burden then shifts to the plaintiff to prove that the stated reason is pretextual. *See Joostberns v. United Parcel Servs., Inc.,* 166 Fed. Appx. 783, 792-794 (6th Cir. 2006).

Aside from her own subjective belief, there is no evidence before the Court that suggests a causal link between Ms. Thompsons's exercise of FMLA rights and her termination.  The only evidence presented by Ms. Thompson is her feeling that she was terminated for taking too much leave.  (Thompson Depo. at pp. 177-78.)  The fact that Ms. Thompson was terminated upon returning from her leave, standing alone, is insufficient to create an inference of causation and her subjective beliefs are insufficient to create a inference that she was terminated because of the amount of leave she used.  Further, had Ms. Thompson established a prima facie case for retaliation under the FMLA by presenting evidence sufficient to show a causal connection, there is no evidence to rebut the legitimate reason articulated by Defendants, department restructuring under Sodexho's management, for eliminating her position.  Accordingly, to the extent that Ms. Thompson's FMLA claim also alleges retaliation, Defendants are entitled to summary judgment as a matter of law.

### Conclusion

For the foregoing reasons, Motions for Summary Judgment filed by Defendants (Document #s46  and 47) are GRANTED.  This case is hereby TERMINATED.

IT IS SO ORDERED.

 s/Donald C. Nugent
DONALD C. NUGENT
United States District Judge


DATED:  October 14, 2008